Opinion delivered March 12, 1887.

## No. ..

## S. A. Milton *v.* The State.

1. Assault with Attempt to Rape.—It is not competent to indict for an assault with intent to rape, and convict upon evidence establishing an attempt to rape by fraud.
2. Same—Attempt to Commit Rape.— Assault with intent to rape can only be established by proof of force or attempted force, and not by proof of threats or fraud as the means of accomplishing the offense. But an attempt to commit rape may be committed by means of threats or fraud, and the use of chloroform as the means comes within the meaning of fraud, and can not be construed to be force.

Appeal from the District Court of Navarro. Tried below before the Hon. Sam. R. Frost.

The conviction in this case was for an assault with intent to rape Miss Allie J. McIntyre, in Navarro county, Texas, on the twenty-seventh day of June, 1886. A term of five years in the penitentiary was the penalty imposed upon the appellant.

G. T. McIntyre, the uncle of the prosecutrix, was the first witness for the State. He testified that, on the twenty-seventh day of June, 1886, he was living with his brother, Johnson McIntyre, the father of the prosecutrix. The family went to church at Pursley, on the night of June 27, 1886, and got back home about ten o'clock. They retired about one minute after eleven o'clock. Johnson McIntyre's house consisted of a front gallery and shed room on the north; the main room, occupied by McIntyre and his wife; a smaller room adjoining, occupied by Miss Allie and her three smaller sisters; a hall, and a smoke house adjoining on the south. The well on the premises was a short distance from the northeast corner of the front shed room. A fence ran in front of the house. Miss Allie called to her mother, during the night, that there was somebody in the house. All of the inmates of the house got up and went into Allie's room. The house was searched, but nobody was found. Mrs. McIntyre went to the hall adjoining Allie's room and brought in a bottle of liquid, the same in evidence. On the next morning, examination of the ground about the house was made, and, at a distance of forty or fifty yards from the house, witness found barefoot tracks going both ways between Franklin's and McIntyre's houses. He traced those tracks to within two hundred and fifty yards of Franklin's house, and left them, still plain, and going in that direction. The tracks could not be found passing McIntyre's house. Some of the tracks seemed to have been dragged over. On the next morning the defendant came to McIntyre's well while the witness was there. He came in a shuffling walk, which was unusual with him. He had one hand in his pocket, and held a bucket in his other hand. Witness spoke to him in a friendly manner. He appeared distressed or annoyed, and did not talk as usual. After that, the witness took the bottle of liquid to Doctor Jester, in Pursley, to be examined. About an hour after witness got to Jester's office, defendant came to Pursley's drug store. Witness and Doctor Jester then went to Pursley's drug store and ascertained that defendant had purchased chloroform there on the day before. Witness thereupon swore out a warrant and had defendant arrested.

Miss Allie J. McIntyre testified, for the State, that she had

known the defendant about four years. She occupied a trundle bed, pulled out in the floor from the large bed in which her three younger sisters slept, in the room next to the hall. The hall door was left open on the night of June 27, 1886. About one o'clock on that night, some one touched witness on the shoulder and waked her up. She lay quiet for about five minutes, when she saw some one move towards her bed. She screamed, and the party left. Her father soon came into the room, but the party had gone. Witness smelt an odor in the room, but did not know what it was. The neck of her dress was found to be wet. She did not recognize the party who entered her room. The entry was made without her consent or knowledge. The party did not touch witness but the one time, that she was aware of. He made no attempt to turn witness in bed, nor to do anything to her. Defendant had acted as escort to witness two or three times, and had endeavored to prosecute his attentions, but witness declined them.

Johnson McIntyre, the father of the prosecutrix, testified, for the State, that his first intimation of the invasion of his house on the night of June 27, 1886, was the screaming of his daughter. When he went into his daughter's room he found that the neck of her night clothing was saturated with something which smelt like the substance in the bottle in evidence. He saw his wife when she found that bottle on the watershelf in the hall. On the next morning he found the track of a man, traveling in sock feet, along the path which led between his house and Franklin's house, where defendant lived. Those tracks were first found in the path about sixty yards from witness's house, where they left the path going towards the house. The space between that point and the house was covered with grass and weeds, and would not show the impression of a foot. Witness followed the tracks some distance towards Franklin's house, and abandoned the trail. He did so because he became satisfied as to who the guilty party was, and did not want to be seen trailing him. Witness then sent the bottle of liquid to Doctor Jester by his brother. He saw the defendant when he came after water on the next morning. The tracks described corresponded with the defendant's foot.

G. T. McIntyre, recalled, testified that, on the morning after the assault, he asked defendant if he went to church on the night before. He replied that he did not, but that he had gone a little beyond Taylor Franklin's, towards Pursley. Witness

saw him pass Franklin's about sundown on the twenty-seventh, going towards Pursley. The bottle of liquid, when found, was open, with the half of a cork stopper pushed down into it and floating.

W. C. Franklin testified, for the State, that the defendant lived at his house in June, 1886. He was gone from home all day Sunday, June 27, 1886, and got home about an hour and a half after dark. It was about ten o'clock when the witness's family got to bed. Witness knew nothing that happened after they all got to bed, but heard a noise in the house, which he thought at the time was made by the children on the floor. Witness went to McIntyre's house next morning and observed the sock feet tracks going and coming between his and McIntyre's houses. He then thought they were the tracks of some negro after chickens. The tracks went up to and from witness's gate. They went to and came from a point in the path opposite McIntyre's house. Upon inspection the witness thought that those tracks corresponded with the defendant's feet. Defendant went to McIntyre's house after a bucket of water on the next morning, June 28. When he came back he said that he was sick, and went to bed. Witness did not know where the defendant went to on Sunday, June 27, 1886, except that he said he started to church, and, after going a part of the way, concluded not to go on. Some time before the alleged assault the witness discarded a pair of old pants, which he hung up in an outhouse that always stood open. He had occasion to use those old pants some time after defendant's arrest, and when he put them on he found a new twisted shoe string and a piece of fresh broken cork stopper in the pocket. Defendant had access to the out house at all times.

Mrs. W. C. Franklin testified, for the State, that defendant came home some time after night on the night of the alleged assault, and advised all parties to go to bed so that witness and her husband could get an early start to Corsicana on the next morning. On the next morning, after he got back from McIntyre's well, defendant reported himself sick. Witness did not want to leave him at home by himself, sick, and tried to prevail on him to go to McIntyre's, but he declined and went to bed. He was arrested on that day. Witness saw the piece of stopper and string found by her husband in his old pants. She had previously seen such a string in the possession of the defendant.

Doctor Jester testified, for the State, that in June, 1886, G.

T. McIntyre brought such a bottle as that exhibited to him at Pursley, to test its contents.  A fragment of cork was floating in the fluid in the bottle.  Witness found the bottle to contain chloroform.  The stopper found with the string, if whole, would about fit the bottle.

J. R. Brown testified, for the State, that he sold defendant a bottle of chloroform late on the evening of Sunday, June 27, 1886.  On the next morning McIntyre brought in such a bottle as that in evidence, which was such a bottle as the witness gave the defendant; and McIntyre asked if defendant had purchased any chloroform there on the day before.  The sale of chloroform was nothing unusual, and witness thought nothing about it.  Defendant asked what was good for screw worms in hogs. The witness recommended cresylic ointment and chloroform, and defendant bought the chloroform.

Several witnesses testified, for the State, that they saw defendant going towards and from Pursley before nightfall on Sunday, June 27, 1886.  Some of those witnesses testified that the defendant owned a small stock of horses and hogs, but that, if the animals were then infested with screw worms, they did not know it.  Others testified positively that there were no screw worms in the country at that time, and two witnesses, testifying particularly to the defendant's stock, said that the stock were not so infested.  W. C. Franklin testified that he had had charge of defendant's hogs since his arrest, and knew them to have been sound.  Hearing that defendant claimed to have purchased the chloroform to doctor his hogs, the witness searched his premises for chloroform, but could find none.

W. C. Lane testified, for the State, that he and defendant lived about one hundred and fifty yards apart.  He saw the defendant standing at McIntyre's gate about nightfall on Sunday, June 27, 1886, and joined him there for no purpose other than to talk. Defendant said that somebody would get left that night, and requested witness to say nothing about it.  He did not say who would get left.  Witness went home, and defendant went, as he said, to get his horse.

Miss Allie McIntyre, recalled for the State, testified that defendant wrote her several letters, none of which were answered except the first one.  Witness's mother wrote that answer rejecting defendant's offer of marriage, and signed witness's name. No chloroform had ever been in witness's father's house prior to that night, so far as the witness knew.

The motion for new trial raised the questions discussed in the opinion.

*Read, Greer & Greer,* for the appellant.

*W. L. Davidson,* Assistant Attorney General, for the State.

WILLSON, JUDGE. The charge in the indictment is an assault with intent to commit rape by means of *force* alone. It is very clearly shown by the evidence that the means used to accomplish the intended crime was *fraud* and not *force.* It was by means of the use of chloroform upon the sleeping woman, that the rape was attempted and intended to be accomplished. Such a means comes within the meaning of fraud as defined by the statute, and can not be construed to be *force.* (Penal Code, arts. 529–531.) The court in its charge properly limited and restricted the jury to a consideration of the offense charged in the indictment, that is, an assault with intent to commit rape by means of *force.* There is not sufficient evidence to warrant a conviction for the offense as charged in the indictment, and, although the evidence is amply sufficient to sustain a conviction for the offense of an *attempt* to commit rape by means of *fraud* this conviction can not stand because the indictment does not allege such offense. It is not competent to indict for an assault with intent to rape, and convict upon evidence establishing an *attempt* to rape by *fraud.*) Williams v. The State, 1 Texas Ct. App., 90.)

An assault with intent to rape can only be established by proof of *force* or attempted force. This offense can not be committed by means of *threats* or *fraud.* The offense of an *attempt* to commit rape may, however, be committed by the use of such means. (Burney v. The State, 21 Texas Ct. App., 565.)

Because the verdict of the jury is contrary to the charge of the court, and is not supported by the evidence, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

Opinion delivered March 12, 1887.

14 — TEX. APP. XXIII.